**CONTINUATION OF APPLICATION FOR A SEARCH WARRANT**

I, Nicholas von Koenig, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with Facebook user ID 100047669221304 ([facebook.com/allmyfukinpagesblocked.dagg.7](facebook.com/allmyfukinpagesblocked.dagg.7)) (the "Target Account"), which is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. (herein "Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the Target Account.

2. I am a detective with the Berrien County Sheriff's Office and a task force officer with the Federal Bureau of Investigation ("FBI"). I have been a deputy with the Berrien County Sheriff's Office since 2010, and have been assigned to the FBI Benton Harbor Safe Streets Task Force since January 2022. I have directed and participated in numerous investigations involving allegations of violations of federal criminal statutes. As part of these investigations, I have applied for and served search warrants for the contents of Facebook accounts. I have also participated in federal criminal investigations involving allegations of people who unlawfully possess firearms.

3. Based on the information set forth herein, there is probable cause to believe that the Target Account belongs to Demarcus GREELY, and that it contains evidence of GREELY's violations of federal law, and specifically (a) his knowing possession of a machinegun in violation of 18 U.S.C. § 922(o), and (b) his knowing possession of a machinegun without a serial number in violation of 26 U.S.C. § 5861(i).

4. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

**PERTINENT LEGAL STANDARDS**

5. 26 U.S.C. § 5845(b) states in pertinent part:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include . . . any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun . . . .

6. 26 U.S.C. § 5845(a) states in pertinent part:

> The term "firearm" means . . . (6) a machinegun . . . .

7. 26 U.S.C. § 5861 states in pertinent part:

> It shall be unlawful for any person . . . (i) to receive or possess a firearm which is not identified by a serial number as required by this chapter.

8. 18 U.S.C. § 921(a)(23) states:

> The term "machinegun" has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).

2

9. 18 U.S.C. § 922(o) states:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to—
>
>> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
>>
>> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

10. According to the U.S. Attorney's Office for the Western District of Michigan (the "USAO"), in *Staples v. United States*, 511 U.S. 600 (1994), the Supreme Court ruled that, to establish that a person has violated 26 U.S.C. § 5861(d), the government must prove that they knew the characteristics of the firearm at issue that brought it within the definition of "firearm" set forth in 26 U.S.C. § 5845(a). Also according to the USAO, in *United States v. Ruiz*, 253 F.3d 634 (11th Cir. 2001), a federal court of appeals ruled that the same requirement applies to alleged violations of 26 U.S.C. § 5861(i).

## PROBABLE CAUSE

11. Federal agents and state and local officers are investigating GREELY for possessing a semi-automatic pistol without a serial number that was outfitted with a so-called "switch" that enabled it to fire more than one shot, without manual reloading, by a single function of the trigger (herein "fully automatically").

**June 12, 2022 Traffic Stop in Benton Harbor, Michigan**

12. On June 12, 2022, police stopped a car for having a broken brake light and no license plate. Upon approaching the car, police noticed it had a temporary registration plate improperly displayed in the upper corner of the rear window. Four people were in the car, including the driver. The driver identified herself by providing a Michigan ID card rather than a driver's license. Police smelled intoxicants and confirmed that everyone in the car was under the age of twenty-one.

13. An officer recognized the front-seat passenger as GREELY based on having encountered him during a different traffic stop. During that stop, another passenger had been arrested for illegally possessing a firearm with an obliterated serial number as a convicted felon. Furthermore, based on his training and experience, the officer believed GREELY to be an associate of My Brother's Keeper ("MBK"), a Benton Harbor gang police believed to have been involved in numerous shootings over the previous two years.

14. Police asked the driver for consent to search the car for open containers of alcohol, and the driver consented. An officer asked GREELY to get out of the car. As he got out, GREELY adjusted something in his waistband, and the officer saw a bulge there. Based on his training and experience, the officer believed the bulge was a firearm and lifted GREELY's shirt, revealing a pistol grip sticking out above his waistband.

15. Another officer walked over to help place GREELY in custody and retrieve the pistol from GREELY's waistband. The pistol was a Polymer P80 "ghost gun," which was unregistered and had no serial number. Based on my training and experience, I understand that Polymer P80 firearms are manufactured by Polymer80, a company that

sells fully assembled firearms, as well as kits of firearm parts that people can buy to assemble their own firearms.

16. The pistol had an automatic switch (the "Switch") affixed to the back of the slide where the armorer's plate would normally go. Below are photographs of the pistol, with the Switch parts circled in red:

 

17. The Switch takes the place of the stock armorer's plate and has an extension on it that stops the firearm's sear from resetting. By preventing the sear from resetting, the Switch enables the pistol to fire fully automatically.

**GREELY'S Facebook Account**

18. Following GREELY's arrest, investigators identified his publicly accessible Facebook account, the Target Account. Investigators compared a recent booking photograph of GREELY with numerous photographs posted to the Target Account, which confirmed the photos posted to the Target Account depicted GREELY. Below is a

5

side-by-side comparison of the booking photograph (on the left) and two photographs of GREELY posted to the Target Account:

  

19. Based on my training and experience, I recognize that in the center and right photographs above, GREELY is displaying gang hand signs.

20. The username for the Target Account is "BankHead BigOpp." Based on my training, experience, and knowledge of this investigation, I understand that members of the MBK gang often refer to rival gang members as "opposition," which is sometimes abbreviated to "opp" or "opps." For this reason, I believe the "BigOpp" portion of the Target Account's username is intended to describe GREELY as a "Big Opposition," or a significant threat to rival gang members.

21. Below is a screen capture of the Target Account's homepage and username, which was saved on June 17, 2022. Based on my training and experience with Facebook, I understand the photograph in the circle on the left is reserved for a Facebook user's "Profile Picture," which is intended to depict the account's user. Based on my prior review of photographs of GREELY and his brother, who died in 2021, I recognize the Target Account's profile picture as showing GREELY and his deceased brother.

6



22. Two publicly available posts by the Target Account depict images of firearms and comments about the images. On June 15, 2022, the Target Account re-posted the image and accompanying comments shown on the next page:

7




23. Based on my training, experience, and knowledge of the investigation, I understand the Target Account's comment to reveal familiarity with the specific model, "G3," of the pictured firearm, which I recognize as a Taurus G3 semi-automatic pistol. I further understand the comment to express an opinion that a G3 pistol should not be altered with aftermarket parts as depicted in the image. I recognize that the G3 pistol has been altered in numerous ways, including by the addition of a scope, extended magazine, carbine conversion system, and front light.

24. On June 9, 2022, the Target Account re-posted the image and comment shown below:



25.     Based on my training and experience, I recognize the firearms depicted in the photograph above as various models of Glock pistols. As originally posted, the above image had an accompanying caption that asked which Glock model people would prefer.[1] In the responsive comment, the Target Account wrote "19" with a sad face emoji, as shown above. Based on my training, experience, and knowledge of the investigation, I believe the comment expressed a preference for a Glock model 19, and that the sad face emoji was added because model 19 was not one of the Glock models in the image.

**Background Information about GREELY**

26.     On July 31, 2021, GREELY's brother, also named Demarcus Greely, was shot and killed. Based on social media research, confidential informant reporting, and witness interviews, police identified GREELY's brother as an affiliate of the MBK gang. In addition, earlier in the day on July 31, 2021, a member of MBK's rival gang, "36," was shot, but survived. Police believe, based on the investigation and sequence of events, that GREELY's brother was killed in a retaliatory gang shooting as a response to the shooting of the 36 member earlier in the day.

27.     On August 7, 2021, one week after the shooting death of GREELY's brother, the residence of a 36 gang member was shot approximately 70 times. A three-year-old girl inside the residence was shot in the shoulder and abdomen. This was the fifth time in seven months this residence had been targeted by gunfire. The homeowner of the

---

[1] The screen capture did not include the accompanying caption underneath the image. Shortly after all relevant posts were screen captured by agents, the Target Account was no longer accessible.

10

residence was interviewed and told police that her son was in a gang which was involved in an ongoing feud with the MBK gang, and that members of the MBK gang were trying to kill her son.

**Officer Training and Experience**

28. Based on my training and experience, I understand the following:

a. Firearms, firearm parts, and firearm accessories, including devices like the Switch, are durable items that people often possess for long periods of time.

b. Gang members who operate in or near Benton Harbor, Michigan, often use Facebook to post photographs of firearms, firearm parts, or firearm accessories; to post photographs of themselves and others using and possessing firearms; to comment on firearm-related photographs posted by others; and to communicate about firearms using Facebook's various communication functions, including "messenger."

c. People who possess devices that enable fully automatic fire, like the Switch, often communicate over the internet to obtain them, including because they are often manufactured abroad.

d. People often possess firearms for a particular reason, which may include their membership in a gang or involvement in gang disputes.

e. Within the past six months, law enforcement officers in the Benton Harbor area have noted an increase in their discoveries of, and interactions with, devices like the Switch that enable semi-automatic firearms to fire fully automatically.

**Conclusion**

29.     On June 15, 2022, I submitted a preservation request to Facebook to preserve the contents of the Target Account.

30.     Based on the foregoing, there is probable cause to believe the Target Account will contain evidence of (a) GREELY and others possessing, using, transferring, or receiving machineguns; (b) GREELY's and others' knowledge of firearms, firearm accessories, and after-market modifications to firearms; and (c) GREELY's and others' knowledge of the appearance, purpose, and function of the Switch and other devices that enable semi-automatic firearms to be fired fully automatically.

**Information about Facebook**

31.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the public.

32.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

33. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

34. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location,

13

host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

37. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and

14

although Facebook does not record the calls themselves, it does keep records of the date of each call.

38. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

39. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

40. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

41. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

42. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.

When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

44. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

45. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

46. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

16

In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information

17

indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information to conceal evidence from law enforcement).

47. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

48. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

49. Based on the foregoing, I respectfully request the Court to issue the proposed search warrant.

50. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

51. There is a case-specific Order for Nondisclosure on file with the Court for this investigation (1:22-MC-63, USAO Investigation #2022R00266). I further request that this search warrant be covered by that Order for Nondisclosure, as notification of the existence of this ECS/RCS investigative request could seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.